**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

VARDEN O. TAPLIN,

                                  Petitioner,

         -v-                                                                Civ. No. 9:04-CV-935
                                                                                        (FJS/RFT)

MICHAEL RABIDEAU,

                                  Respondent.

**APPEARANCES:**                                      **OF COUNSEL:**

VARDEN O. TAPLIN
Petitioner, *Pro Se*
02-B-1652
Groveland Correctional Facility
7000 Sonyea Rd.
Sonyea, N.Y. 14556

HON. ANDREW M. CUOMO                          MARIA MORAN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Attorney for Respondent
615 Erie Boulevard West
Suite 102
Syracuse, N.Y. 13204-2455

**RANDOLPH F. TREECE**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

    *Pro se* Petitioner Varden O. Taplin was convicted of two counts of sodomy in the third degree

and one count of rape in the third degree on July 30, 2002. Dkt. No. 1, Pet. at p. 2; Dkt. No. 12, Resp't

Mem. of Law at p. 1; State Court R. on Appeal, Exs. A-G, Trial Tr., dated June 17, 2002, at pp. 631-32

(hereinafter "Trial Tr."). Petitioner presently seeks a Writ of *Habeas Corpus* pursuant to 28 U.S.C. §

---

[1] This matter was referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

2254 on the following grounds: (1) the trial court erred by failing to suppress his oral and written statements;[2] (2) the prosecutor withheld *Brady* material; (3) an adverse inference must be drawn against the prosecution because the police did not tape his interview; (4) the trial court improperly permitted the prosecution to amend count four of the indictment to allege a new theory on the day of jury selection; (5) the grand jury presentation was insufficient; (6) his sentence should be modified; and (7) the verdict was against the weight of the evidence.[3]   Pet. at pp. 3 & 7-8, Attach. to Questions #9 at Points I-VI & #22 at A-C; Dkt. No. 13, Traverse, at pp. 1-3.   For the reasons that follow, this Court recommends that the Petition be **DENIED**.

## I.  BACKGROUND

On October 28, 2001,  Petitioner was indicted by an Oswego County grand jury.  Resp't Mem. of Law at p. 3; State Court R. on Appeal, Ex. J, App., Vol. 1, at pp. 6-7.   In that accusatory instrument, Petitioner was charged with two counts of rape in the third degree, two counts of sodomy in the second degree, and two counts of sodomy in the third degree.  App., Vol. 1, Original Indictment, at pp. 6-7.

---

[2] Petitioner challenges the admission of his oral statements in Ground One of his Petition, and the admission of his written confession in Ground Two.  Pet. at ¶ 22(A) & (B).  For the sake of clarity, the Court will address these claims together.

[3] Grounds 3 through 7 are raised by Petitioner in response to question number 9 of the *habeas* petition form, which requires a petitioner to set forth any grounds that were raised on direct appeal in the state court.  *See* Pet. at ¶ 9.  Petitioner set forth the grounds raised on appeal, and included attached arguments as to each point.  In several of these attached pages, Petitioner re-asserts the direct appeal ground as a ground for *habeas* relief.  For example, in the "attachment to question #9, Point I," he states, "Petitioner contends that the confession was conducted in such a manner that it violated his rights under the fifth and sixth amendments of the United States Constitution."  In "Attachment to question #9, Point IV," Petitioner specifically "requests that this Court review [the grand jury] proceedings."  Additionally, in response to question number 22, which requires the petitioner to state each ground for *habeas* relief, Petitioner refers this Court to all of the attached pages.  Pet. at ¶ 22 ("please see attached").  Because of the Petitioner's *pro se* status, the Court will construe the Petition liberally in his favor and address these claims even though they are not pleaded separately as grounds for *habeas* relief under question number 22.  *See McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) (stating that the pleadings of a *pro se* litigant must be construed liberally); *Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir.1983) ( "[D]ue to the *pro se* petitioner's general lack of expertise, courts should review habeas petitions with a lenient eye, allowing borderline cases to proceed. These views are wholly consistent with Supreme Court doctrine, which confirms that pro se complaints must be liberally construed and their allegations accepted as true.") (citations omitted); *Carter v. Perlman*, 2006 WL 891089, at *3 (E.D.N.Y. Apr. 6, 2006).

The Indictment alleged that beginning in 1997, Petitioner sexually abused his step-daughter, J.T.,[4] at various locations in Oswego County, New York.

A *Huntley*[5] hearing was held on February 25, 2002.  *See Huntley* Hr'g Tr., dated Feb. 25, 2002 (hereinafter "Hr'g Tr."); App., Vol. 1, *Huntley* Decision and Order (hereinafter "D/O"), dated Mar. 12, 2002, at p. 20.  The first witness to testify at the hearing was Investigator Dean Burridge of the Fulton Police Department.  He stated that he became involved in the investigation of Taplin's alleged sexual abuse of his step-daughter on June 5, 2001.  Hr'g Tr. at pp. 7-8; D/O at p. 20.  He discussed the investigation with other officers and suggested that they try to tape record a conversation between J.T. and Taplin.  Hr'g Tr. at pp. 8-9; D/O at p. 20.  Burridge met with J.T. on June 5, 2001, at 9:30 p.m.  At that time, J.T. was sixteen years old.  Hr'g Tr. at pp. 8-9; D/O at p. 21.  She agreed to call Taplin at his home and to try to get Taplin to make admissions.  Hr'g Tr. at pp. 11-12 & 47-49; D/O at p. 21.  Burridge told J.T. she should ask Taplin questions about the alleged sexual contact she described to police.  Hr'g Tr. at pp. 49-51; D/O at p. 21.  Burridge did not prepare the questions.  Hr'g Tr. at pp. 49-51.  J.T. spoke to Taplin, while Burridge listened to her end of the conversation, and the phone call was recorded.  *Id.* at pp. 13-15; D/O at pp. 21-22.

The recording was played at the *Huntley* Hearing.  At the beginning, J.T. announced her permission to record the conversation.  D/O at p. 21.  During the conversation, J.T. told Taplin that she wanted to move back home.  She told him that if she moved back, the oral sex would have to stop.  *Id.*  Taplin replied, "whatever" and denied the accusation.  *Id.*  Taplin asked J.T. "How many others have you told?" *Id.*  Taplin told J.T. that if she moved back home, she could not skip school, smoke, hang

---

[4] In the interest of protecting the privacy of the victim, the Court will refer to the victim by her initials.

[5] A *Huntley* Hearing determines the voluntariness of inculpatory statements made by a criminal defendant to law enforcement officers.  *See People v. Huntley*, 204 N.E.2d 179 (N.Y. Ct. App. 1965).

out with certain people, and that he would not put up with her lying.  *Id.*  J.T. asked Taplin if the oral

sex would stop, and Taplin stated it would.  He asked her how many times he had to tell her that.

Taplin also told J.T. not "to be telling anyone about the other" and again asked J.T. whom she told.  *Id.*

at pp. 21-22.

On June 6, 2001, at 6:45 p.m., Burridge again met with J.T.  Hr'g Tr. at p. 21.  Burridge wanted

her to make a second call to Taplin in order to gain admissions, and, again, she agreed.  *Id.*  The second

conversation lasted about ten minutes and was also recorded.  *Id.* at pp. 32-33.  At the beginning of the

tape, J.T. again grants the Fulton Police Department permission to record her conversation.  D/O at p.

22.  During this conversation, Taplin told J.T. that he spoke to her grandfather and told him J.T. wanted

to move back in with him.  *Id.*  He also told J.T. that he was not playing games and was not going to

let her yell at and boss the other kids around.  He reiterated that she would have to go to school and

could not hang out with certain people.  *Id.*  Taplin told J.T. that her mother was not moving back in,

but that he would let her see the kids and warned J.T. not to tell her mother otherwise.  *Id.* at p. 23.  J.T.

asked Taplin to promise that "he wouldn't."  Before she could state what conduct she wanted  Taplin

to refrain from, Taplin responded, "That's the last time I want to hear that."  He also told J.T., "Don't

start hauling that on me."  *Id.*

Immediately following the second conversation, Burridge asked Officer Ludington and

Investigator Shatrau to go to Taplin's house and ask him to come to the police station for an interview.

Hr'g Tr. at p. 35; D/O at p. 24.  When Taplin arrived, he was not in handcuffs.  Burridge told Taplin

that he was not in custody, was not under arrest, and that he could end the interview at any time, and

that he could leave at any time.  Hr'g Tr. at pp. 35-37; D/O at p. 24.  Burridge did not give Taplin his

*Miranda* warnings.  Hr'g Tr. at pp. 37-38; D/O at p. 24.  He told Taplin that J.T. reported being

4

sexually abused by Taplin starting at age nine or ten at various locations in Oswego County, New York. Taplin agreed to stay and talk to Burridge.  Hr'g Tr. at p. 37; D/O at p. 24.  Taplin denied the allegations.  He explained to Burridge that J.T. called him the previous night to discuss moving back in with him and he questioned why she would do that and then make these allegations.  *Id.*  Burridge told Taplin that the call came from the police station and it had been recorded.  Burridge played a portion of the second tape so that Taplin could hear his own voice.  Hr'g Tr. at pp. 37-39; D/O at p. 24.

Taplin became nervous.  His leg and lower lip were shaking.  Burridge asked Taplin why he was denying the allegations when he made admissions to J.T. on the phone.  *Id*.  Taplin then admitted he sexually abused J.T.  Specifically, he told Burridge that he had oral sex with J.T. in Mexico, New York, and that he had oral sex and sexual intercourse with her in Fulton, New York.  Hr'g Tr. at pp. 39-40; D/O at p. 24.  Taplin stated that the last sexual contact was in February 2001.  *Id.* The statement was reduced to writing and Burridge asked Taplin to read the first paragraph aloud.  He did so, read the rest of the statement, and signed it.  Hr'g Tr. at p. 40; D/O at p. 25.

When the interview was over, Burridge drove Taplin home.  Hr'g Tr. at p. 42; D/O at p. 25. Burridge  brought Taplin's three other children to the police station to be interviewed that night.  On June 11, 2001, Taplin voluntarily returned to the police station, where he was placed under arrest. Hr'g Tr. at p. 44; D/O at p. 26.

Burridge testified that Taplin never indicated a desire to leave during the interview and he never asked for counsel.  Hr'g Tr. at pp. 42-43.  Burridge acknowledged that he had probable cause to arrest Taplin on June 5, 2001, based on J.T.'s statement, but that he wanted more evidence.  *Id*. at pp. 49 & 52-53; D/O at p. 26.  Burridge testified that he did not advise Taplin of his *Miranda* rights because

Taplin was not in custody.  Hr'g Tr. at pp. 60-61 & 65-66; D/O at p. 26.  He denied telling Taplin he did not need a lawyer and he testified that he did not threaten to remove Taplin's children from the home if he did not confess.  Hr'g Tr. at pp. 61-62; D/O at p. 26.

Investigator Christopher Shatrau testified that on June 6th, he went to Taplin's house with Officer Ludington  and asked Taplin if he would come to the police station for an interview.  Hr'g Tr. at pp. 70-71; D/O at p. 27.  Shatrau was not in uniform, but Ludington was.  Taplin agreed, but stated he had to make child care arrangements.  Hr'g Tr. at p. 71; D/O at p. 27. Taplin was not handcuffed and was not threatened.  Hr'g Tr. at pp. 71-73; D/O at p. 27. Shatrau did not tell Taplin the reason for the interview.  Instead, he told Taplin that they would discuss the matter at the police station.  Hr'g Tr. at pp. 76-77 & 81-82.

Taplin testified on his own behalf.  He stated that Shatrau and Ludington never asked him if he would come to the police station, but instead told him he was going with them and would not tell him why.  Hr'g Tr. at p. 86; D/O at p. 28.  He acknowledged that he was not arrested nor handcuffed and he did not ask for an attorney during the trip to the police station because he did not know why he was going.  Hr'g Tr. at pp. 89 & 97-98.  When he arrived at the station, Burridge began questioning him about the alleged sexual abuse.  Taplin testified that he kept denying the accusations.  Hr'g Tr. at pp. 89-90; D/O at p. 28. Taplin denied that Burridge played one of the taped conversations.  Hr'g Tr. at pp. 94-95.  Taplin acknowledged his lip was trembling but testified that it was because he was cold and under stress.  *Id*. at p. 90.  Taplin testified that Burridge threatened to take his children away if he did not confess.  Hr'g Tr. at p. 90; D/O at p. 28.  He also testified that Burridge told him if he signed a statement, Burridge would keep him out of jail.  Hr'g Tr. at pp. 99-100.  Taplin acknowledged that he never asked Burridge for a lawyer and claimed that he made the statement to avoid losing his children.

*Id*. at pp. 90-92.  Taplin claimed he told Burridge to type what he wanted and Taplin would sign it.  He

denied reading the statement until approximately six weeks later.  *Id*. at pp. 92 & 100.  Taplin testified

he did not believe his statement was voluntary because he made it to try to keep his children.  *Id.* at pp.

92-93; D/O at p. 28.  He further testified that he tried to end the interview before signing the written

statement, but that he knew if he tried to get up he would be arrested.  Hr'g Tr. at pp. 95-96.  He

claimed he told Burridge he wanted to end the interview and go home, but Burridge told him he would

only be a few more minutes.  Burridge dialed his home number at that point so that Taplin could ask

his friend to stay with the children a bit longer.  *Id*. at p. 96.  Finally, Taplin testified that if he had

believed he had a choice in going to the police department, he never would have gone and that he was

not thinking when he signed the statement.  *Id*. at pp. 93-94.

In a Decision and Order, dated March 12, 2002, the trial court denied Taplin's motion to

suppress his taped oral statements and his written statement.  D/O at pp.  20-33.  The court stated that

it observed each witness as they testified and found Taplin to be incredible: "The Court does not believe

that Defendant, knowing he was being investigated for a crime, would blindly sign a written statement

that admitted to sexually abusing the alleged victim without reading it."  *Id.* at pp. 29-30.  The court

found Burridge and Shatrau "entirely credible."  *Id.* at p. 30.  The court ruled that Taplin was not in

custody when he made the statements because he was not in handcuffs or otherwise restrained, was

informed he could leave at any time, the interview lasted less than an hour, and the questioning was not

the type that "would tend to produce a false statement."  *Id.* at pp. 30-31.  The court ruled that Taplin

was not threatened nor coerced into giving the statement and that he was never promised leniency in

exchange for the confession.  *Id.* at p. 31.

The court also ruled that the taped conversations were admissible because Taplin was not in

7

custody when they were made.  The court further stated that there was no Sixth Amendment violation of Taplin's right to counsel because no formal criminal proceedings had begun and, although J.T. was acting as an agent of the police, she consented to the taping of the conversation.  The court noted that it was not illegal to eavesdrop on a telephone conversation where police had the consent of one of the parties.  *Id.* at pp. 32-33.  Thus, the motion to suppress was denied.  *Id.* at p. 33.

In the same Decision and Order, the trial court also permitted the People to amend the date in count two of the indictment.  D/O at pp. 10-11; Trial Tr. at pp. 3-13.  Furthermore, it ordered the People to specify the time frame applicable to counts three and four of the indictment and to state the municipality in which these acts occurred.  D/O at pp. 11-12. The court dismissed counts five and six of the indictment, charging Petitioner with second degree sodomy, on the ground that there was insufficient evidence presented at the grand jury to support these charges.  *Id.* at pp. 13-16.

The People filed an amended bill of particulars in compliance with the court's order on April 8, 2002.  Dkt. No. 12, Ex. K, App., Vol. 2, People's Resp. to Bill of Particulars, at pp. 196-99.  In the bill of particulars, the People changed the factual allegations supporting count four of the indictment. Originally, this count charged Petitioner with sodomy based upon mouth to penis contact.  App., Vol 1, Original Indictment, at p. 7.  In the amended bill of particulars, the People claimed this count related to penis to anus contact.  App., Vol. 2, People's Resp. to Bill of Particulars, at p. 198, ¶ 20.

Subsequently, on June 17, 2002, the trial commenced.  Prior to jury selection, the prosecutor moved to formally amend count four of the indictment to reflect penis to anus contact because that theory of the case matched the grand jury testimony and the legal instructions given to the grand jury. Trial Tr. at pp. 5-6. Defense counsel objected, claiming unfair surprise.  *Id.* at pp. 7-10.  The trial court permitted the amendment, finding that counsel was put on notice of the change in the prosecutor's

theory of count four in a letter dated March 7, 2002.  *Id.* at pp. 18-21.

On June 18, 2002, prior to opening statements, defense counsel moved for a mistrial or an adjournment to further prepare his defense.  That morning, the prosecutor gave him a letter in which the People informed him that when questioned by Burridge, J.T. denied that any incident involving penis to anus contact had occurred.  Trial Tr. at pp. 94-97.  The prosecutor responded that she first learned of this information the night before and immediately informed counsel.  *Id.* at pp. 95-96.  The trial court denied an adjournment and declined to order a mistrial, deciding that counsel was provided with the information before any witnesses testified and was thus not prejudiced.  *Id.* at pp. 97-98.

According to the testimony adduced at trial, Petitioner married J.T.'s mother when J.T. was a baby.  Trial Tr. at pp. 171-72 & 198-99.  Petitioner and J.T.'s mother had three children of their own, a boy and two girls.  *Id.* at pp. 172 & 198.  From November 1999 through February 2001, J.T. and her family lived in Altmar, in the Town of Albion, New York.  *Id.* at pp. 175-76 & 254.  J.T. was 14 years old and started eighth grade that year.  *Id.*  Sometime during that time period, Petitioner brought J.T. into his bedroom.  He pulled down her pants and had sexual intercourse with her by placing his penis inside her vagina.  *Id.* at p. 178.  J.T.'s mother and siblings were asleep during the incident.  *Id.*

During that same time period, in late fall or early winter, J.T.'s brother, then 14, was away from home at a school wrestling match.  J.T. shared a bedroom with her sisters and could not sleep, so she went to her brother's bedroom for the night.  *Id.* at pp. 178-80 & 200-202.  J.T.'s mother and sisters were home and asleep.  *Id.* at pp. 201 & 203-04.  Petitioner came into the room, bent J.T. over her brother's weight bench, and tried to place his penis in her anus.  *Id.* at p. 179.  J.T. told Petitioner to stop because it hurt, and he did so.  *Id.*  The incident lasted about a minute.  *Id.* at pp. 208-09.  J.T. did not call out for help or scream and Petitioner told her not to tell anyone.  *Id.* at pp. 180, 207, & 209.

Over winter break in February 2001, the family moved to 405 Utica Street in Fulton, New York. *Id*. at pp. 175-77 & 214.  When J.T. was in eighth grade and 14 years old, Petitioner had sexual intercourse with J.T. in his bedroom by placing his penis into J.T.'s vagina. *Id.* at pp. 176 & 253-54.  When he started to ejaculate, he pulled out of her vagina and finished ejaculating in her mouth. *Id.* at p. 176.  Sometime during April 2001, J.T. was in her bedroom taking a nap.  *Id*. at pp. 174-75.  Petitioner woke her up, took her to his bedroom, pulled down his pants, and made her perform oral sex on him by placing his penis in her mouth until he ejaculated. *Id.* at p. 174.  J.T. testified that during these incidents, her mother was asleep or at Bingo or lingerie parties.  Trial Tr. at pp. 198-200 & 216.

In May 2001, J.T. came home an hour late, and was told she was moving out of her parents' home. *Id*. at p. 181.  J.T. went to live with her grandmother at 235 Cayuga Street in Fulton, New York, and in June 2001, she and her cousin went to the Fulton police to report Petitioner.  *Id.* at pp. 170-71 & 181.  J.T. decided to file a report because she no longer lived with Petitioner and thought he should be punished for his actions. *Id.* at pp. 181 & 187.  J.T. did not tell the police sooner because Petitioner told her not to tell anyone "because something might happen." *Id.* at p. 180.  J.T. did not tell police about the incident involving anal intercourse, but testified about the incident before the  grand jury. *Id.* at pp. 212-14, 345-46, & 348.  At trial, J.T. testified that there was a total of two instances of sexual intercourse and a few instances of oral sex. *Id.* at pp. 218-19.  Although J.T. told police that Petitioner committed the acts two or three times a week, she testified that it did not happen that often. *Id.* at p. 219.  J.T. did not like Petitioner because of these incidents and wanted him out of the house.  She never told her mother how she felt. *Id.* at pp. 247-49 & 256.

Investigator Burridge's testimony at trial was consistent with his prior testimony during the Huntley Hearing regarding his investigation, interview of Petitioner, and eventual arrest. *See id.* at pp.

313-69.  Burridge testified that during his interview, Petitioner explained that the first time he had sexual intercourse by placing his penis in J.T.'s vagina was when the family lived in Altmar sometime between November 1999 and February 2001.  *Id.* at p. 332.  He further admitted to having oral sex with J.T. about once every three months during that time period.  *Id.*  Petitioner also told Burridge that he had oral sex with J.T. at the Fulton address after February 2001.  *Id.*  Finally, Petitioner admitted his actions were wrong, claimed he needed help and had been going through a lot of stress, and would do whatever it took to prevent something like this from happening in the future.  *Id.* at p. 333.  He did not tell Burridge he engaged in anal intercourse with J.T.  *Id.* at p. 345.  Burridge testified that he and Petitioner spoke about the allegations for approximately forty minutes before Petitioner agreed to reduce the statement to writing.  *Id.* at pp. 327-28.  The written statement began at 8:10 p.m. and ended at 8:51 p.m. The interview was not recorded.  *Id.* at p. 358.

After that statement was given, Investigator Burridge drove Petitioner home.  He asked Petitioner to keep in touch with him in case further information was needed.  *Id*. at p. 362.  Burridge asked Petitioner if he could interview the other three children and Petitioner agreed.  *Id.* at p. 334.  Burridge took the three children to the police station to be interviewed.  *Id.*  On June 11, 2001, Petitioner voluntarily returned to the police department after Burridge called him and asked him to come down.  *Id.*  Petitioner was then arrested.  *Id.*  At the time of trial, J.T.'s mother and Petitioner had reconciled and were living together with J.T.'s brother.  J.T.'s two sisters were living in a foster home in Hannibal, New York.  *Id.* at p. 257.

Nancy Bidinger, a nurse practitioner, testified that she examined J.T. on June 14, 2001, for signs of sexual abuse.  *Id*. at pp. 272-75.  Her examination was normal, and "neither confirmed nor denied the suspicion of sexual abuse."  *Id.* at pp. 275 & 284.

After the prosecutor rested its case, the defense presented several witnesses. *Id.* at pp. 370-502. The witnesses included two of J.T.'s three siblings, her ex-boyfriend, her three uncles, her aunt, family friends, and her mother.  Each witness testified they were unaware of any incidents of sexual abuse. *Id.* at pp. 388-89, 393, 396, 399-400, 404-05, 408, 415-19, 430, & 453.  J.T.'s brother testified that on the night of his school wrestling meet, he returned home around 10:30 p.m. and slept in his own bed. Petitioner and his mother waited up for him, but his sisters, including J.T., were asleep.  *Id*. at pp. 463-67.  Darcy Noble, Petitioner's friend, testified that he was with Petitioner on all three occasions when his fiancee, or Petitioner's wife, or mother-in-law hosted lingerie parties.  *Id*. at pp. 433-42.

At the conclusion of the trial, Petitioner was convicted of rape in the third degree (one count) and sodomy in the third degree (two counts).  *Id*. at pp. 631-32.   On July 30, 2002,  Petitioner was sentenced to consecutive indeterminate terms of one and one-third to four years incarceration for rape in the third degree (count three) and sodomy in the third degree (count two).  He was sentenced to a concurrent indeterminate term of one to three years incarceration for the remaining count of sodomy under count four of the indictment.  Dkt. No. 12, Ex. H, Sentencing Tr. at pp. 13-15.  With the assistance of counsel, Petitioner filed a Notice of Appeal on August 1, 2002.  Dkt. 12, Ex. I.

On April 22, 2003, through counsel, Petitioner perfected his direct appeal of his convictions and sentences to the New York State Supreme Court, Appellate Division, Fourth Department.  App., Vol. 1, at pp. 1-106 & Vol. 2, at pp. 107-221; Dkt. No. 12, Ex. L, Appellate Br.  That court modified the judgment of conviction by reversing Petitioner's conviction on count four of the indictment and dismissing that count, finding that the county court improperly permitted the People to amend the indictment to change the theory of prosecution, and otherwise affirmed the convictions.  *People v. Taplin*, 767 N.Y.S.2d 541 (N.Y. App. Div., 4th Dep't 2003); *see also* Dkt. No. 12, Ex. N. The New

York State Court of Appeals denied Petitioner leave to appeal on February 3, 2004. *People v. Taplin*,

808 N.E.2d 1292 (N.Y. Ct. App. 2003); *see also* Dkt. No. 12, Ex. O.

## II. DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court

may not grant *habeas* relief to a state prisoner on a claim unless the state courts adjudicated the merits

of the claim and such adjudication either

> 1) resulted in a decision that was contrary to, or involved an unreasonable application
> of, clearly established Federal law, as determined by the Supreme Court of the United
> States; or
> 2) resulted in a decision that was based on an unreasonable determination of the facts
> in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Hawkins v. Costello*, 460 F.3d 238, 242 (2d Cir. 2006); *DeBerry v. Portuondo*,
403 F.3d 57, 66 (2d Cir. 2005); *Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d Cir. 2003); *Boyette v.
LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001).

The AEDPA also requires that in any such proceeding "a determination of a factual issue made

by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting

the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also*

*Boyette*, 246 F.3d at 88 (quoting § 2254(e)(1)).

A state court determines a petitioner's federal claim "on the merits" and triggers the highly-

deferential AEDPA standard of review when the state court (1) disposes of the claim on the merits and

(2) reduces its disposition to judgment. *See Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). In

this regard, it is not necessary for the state court to explicitly refer to the particular federal claim or to

any federal case law. *See id.*

If, however, a state court does not adjudicate a petitioner's federal claim "on the merits," the

state court's decision is not entitled to AEDPA deference and instead, the federal *habeas* court must

apply the pre-AEDPA standard of *de novo* review to the state court's disposition of the federal claim.

*See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) (citing *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d

Cir. 2001)).

## B.  Suppression

Petitioner claims that his oral and written statements should have been suppressed because (1)

the oral statements were recorded without his knowledge and at the "behest" of the police; (2) he was

illegally detained or in custody when the written statement was made and was not given his *Miranda*

warnings; (3) his written statement was involuntary because it was coerced by the use of the oral

statements; (4) the written statement was the "fruit" of the alleged unlawful recording of the oral

statements; and (5) the police had probable cause to arrest him but delayed the arrest to obtain a

confession. Pet. at ¶¶ 9, 22(A) & (B).  The Appellate Division ruled that the trial court properly denied

Petitioner's motion to suppress the oral statements because, although J.T. was acting as an agent of the

police, the calls were recorded with her consent and no threats were made "that would create a risk that

Petitioner might falsely incriminate himself."  *People v. Taplin*, 767 N.Y.S.2d at 542.  It further found

that Petitioner was not in custody or coerced into making his written statement.  *Id.*  The court also

noted that he was not "in handcuffs or otherwise restrained, he voluntarily accompanied the officers

to the police station and he was informed that he could leave at any time."  *Id*.  These factors supported

a conclusion that a "reasonable person in [Petitioner's] position, innocent of any crime, would not have

believed that he was in custody."  *Id.*  Finally, the court noted that Petitioner failed to preserve for

appellate review his argument that the written statement was the "fruit of the poisonous tree of the

telephone conversations between the victim and him" under New York's contemporaneous objection

14

rule. *Id.* (citing N.Y. CRIM. PROC. L. ("CPL") § 470.05(2)).

Under the AEDPA, a state court's factual findings at a suppression hearing are presumed to be correct, and the petitioner has the burden of overcoming that presumption by clear and convincing evidence. *See Campbell v. Greene*, 440 F. Supp. 2d 125, 141 (N.D.N.Y. 2006)(McCurn, S.J.); *James v. Walker*, 2003 WL 22952861, at *6 (E.D.N.Y. Aug. 28, 2003), *aff'd*, 116 Fed. Appx. 295, 297 (2d Cir. 2004) (unpublished opinion). Notwithstanding the deference accorded to factual determinations, "legal questions, such as whether a defendant has effectively waived his federal constitutional rights in a proceeding, are governed by federal standards." *Oyague v. Artuz*, 393 F.3d 99, 104 (2d Cir. 2004) (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)). Petitioner bears the burden of establishing that his rights were violated. *Whitaker v. Meachum*, 123 F.3d 714, 716 (2d Cir. 1997).

### 1.    Fourth Amendment

To the extent that Petitioner asserts, as a basis to challenge the trial court's failure to suppress his admissions, that his Fourth Amendment rights were violated as a result of an alleged "unlawful arrest," this claim is not cognizable on federal *habeas* review. *See Stone v. Powell*, 428 U.S. 465 (1976); *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992); *Campbell,* 440 F.Supp. 2d at 138-39. Pursuant to *Stone*, a petitioner is not entitled to *habeas* relief if the state courts provided "an opportunity for full and fair litigation" of a claim under the Fourth Amendment. *Stone*, 428 U.S. at 482. The Supreme Court has since extended *Stone* to preclude *habeas* review of a "Fourth Amendment challenge to the introduction of a confession made after an allegedly unlawful arrest." *Glover v. Herbert,* 431 F. Supp. 2d 335, 338 (W.D.N.Y. 2006) (citing *Cardwell v. Taylor*, 461 U.S. 571, 572-73 (1983) (*per curiam*) (reversing grant of *habeas corpus* where circuit court of appeals had found that there was an unattenuated causal link between the custodial statements made by respondent and a violation of the

Fourth Amendment)).  A federal court may only review a claim based on the Fourth Amendment "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan,* 975 F.2d at 70 (citing *Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir. 1977)); *Campbell,* 440 F. Supp. 2d at 138 (citing *Capellan*).

New York law provides such a corrective procedure for Fourth Amendment claims in the form of a suppression hearing.  *See* CPL §§ 710.10 *et seq.*; *see also Capellan,* 975 F.2d at 70 n.1 (holding that "federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate").  Petitioner availed himself of that procedure by making a motion to suppress his oral and written statements, which the trial court denied after a hearing, and by appealing that denial.  The trial court rendered a written opinion which clearly stated its findings of fact and conclusions of law.  D/O at pp. 20-33.  Although Petitioner testified that he believed he was in custody and was not free to leave prior to giving his written statement, he did not explicitly raise a Fourth Amendment claim that he was illegally detained or unlawfully arrested at the time he made his statement, and does not now allege that he was precluded from a full and fair hearing on a Fourth Amendment issue.   The Second Circuit has held that "once it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief." *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002).  There is no evidence that the trial court failed to conduct a suppression hearing or that Petitioner was precluded from asserting a Fourth Amendment claim.  Petitioner's claim, to the extent that it

implicates the Fourth Amendment, is barred by *Stone* and *Cardwell*.  *See Campbell,* 440 F. Supp. 2d at 139-40 (citing, *inter alia*, *Morales v. Walsh*, 2003 WL 23185770, at *15 (E.D.N.Y. Oct. 30, 2003)).

### 2.      Fifth Amendment

The Fifth Amendment to the United States Constitution provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself[.]"  U.S. Const. amend. V. In that context, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), "a person questioned by law enforcement officers after being taken into custody or otherwise deprived of his freedom of action in any significant way must first be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks omitted); *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  In determining whether an individual is considered "in custody" for *Miranda* purposes, courts must consider whether "a reasonable person would have believed he was at liberty to end the interrogation, taking into account the specific circumstances surrounding the subject questioning." *Campbell,* 440 F. Supp. 2d at 140 (citing *Thompson v. Keohane*, 516 U.S. 99, 111 (1995)).  Those circumstances include whether a suspect is told that he is free to leave (*see Campaneria v. Reid*, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989)); whether the suspect is handcuffed (*see United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004)); the location and atmosphere of the interrogation (*see Mathiason*, 429 U.S. at 494-95); the language and tone used by the police (*see United States v. Guarno*, 819 F.2d 28, 31-32 (2d Cir.1987)); and the length of the interrogation (*see Yarborough v. Alvarado,* 541 U.S. 652, 665 (2004); *Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984)).

An officer is not required to administer *Miranda* warnings to every person they question, even

if that questioning takes place at the police station. *Stansbury*, 511 U.S. at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue[.]"); *Mathiason*, 429 U.S. at 495 (finding defendant not in *Miranda* custody even though police presented him with false evidence of his guilt during questioning at the police station); *Beckwith v. United States*, 425 U.S. 341, 347 (1976) (being the focus of a criminal investigation is not sufficient to render one in *Miranda* custody); *Cruz v. Miller*, 255 F.3d 77, 81-82 (2d Cir. 2001) (*Miranda* warnings not required simply because the questioning takes place in a coercive environment such as a police station); *United States v. Cota*, 953 F.2d 753, 756-59 (2d Cir. 1992) (suspect not in *Miranda* custody even though she was initially removed from her car at gunpoint and placed in handcuffs, which were eventually removed, before acceding to a police officer's request for a station house interview).

Here, the police went to Petitioner's home and asked him to come to the police station; after making child care arrangements, Petitioner agreed. He was not handcuffed nor restrained in any way. Investigator Burridge told Petitioner that he was not under arrest and could leave whenever he wanted to. The interview lasted just under two hours. Although Petitioner was the prime suspect and Burridge intended to arrest him at some point, Burridge drove Petitioner home. He was arrested the next day. All of these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave. *Mathiason*, 429 U.S. at 494-95 (finding defendant not in custody where he voluntarily came to the police station, was immediately informed that he was not under arrest, and was allowed to leave without hindrance at the close of the interview); *Harris v. Woods*, 2006 WL 1140888 (S.D.N.Y. May 1, 2006) (petitioner who voluntarily agreed to accompany police to the police station for questioning, without more, is not in custody). Both the trial court and the Appellate Division determined that Petitioner was not in custody. Because of

the "difficulty of determining 'custody' for purposes of *Miranda* . . ., unless the facts clearly establish custody, a state court should be deemed to have made a reasonable application of clearly established Supreme Court law in concluding that custody for *Miranda* purposes was not shown." *Cruz,* 255 F.3d at 85-86.  The state courts' determination that Petitioner was not in custody is reasonable in light of the evidence presented at the suppression hearing and was not contrary to clearly established Supreme Court precedent. This claim should be **dismissed**.

To the extent that Petitioner challenges the taped oral statements under the Fifth Amendment, that claim also fails. The Supreme Court has stated that "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust" in another.  *Illinois v. Perkins*, 496 U.S. 292, 297 (1990), *accord United States v. Holmes*, 44 F.3d 1150 (2d Cir. 1995) (relying on *Illinois v. Perkins* in rejecting defendant's challenge to government's use of a third-party to tape record incriminating conversations). "Strategic deception" includes "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion . . . are not within *Miranda's* concerns."  *Perkins*, 496 U.S. at 297.  Here, Investigator Burridge did nothing more than take advantage of Petitioner's relationship with J.T.  Petitioner voluntarily spoke to J.T. and was unaware that she was calling from the police station under Investigator Burridge's instruction.  J.T. did not coerce or threaten Petitioner during their conversations. The taped oral statements were not obtained in violation of Petitioner's Fifth Amendment privilege against self incrimination and this claim should be **denied**.

Finally, Petitioner's argument that his written statement was the "fruit" of the alleged unlawfully recorded oral statements is procedurally barred.  The Appellate Division ruled that Petitioner failed to preserve his claim that his written statement was the fruit of the recorded telephone conversations under

New York's contemporaneous objection rule.  CPL § 470.05(2).  New York's contemporaneous objection rule requires that in order to preserve an issue for appellate review in the New York State courts, the defendant must object to the alleged error at trial at a time when the trial court has an opportunity to correct the alleged error.  *See id.*; *People v. Patterson*, 347 N.E.2d 898, 902 (N.Y. Ct. App. 1976) ("Strict adherence to the requirement that complaint be made in time to permit a correction serves a legitimate State purpose.")(citing *Henry v. Mississippi*, 379 U.S. 443, 447 (1965)).  A denial of a claim under CPL § 470.05(2) rests on an adequate and independent state procedural ground, and this claim is therefore procedurally barred.  *See Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999) ("[W]e have observed and deferred to New York's consistent application of its contemporaneous objection rules.") (citations omitted).

This Court may review this procedurally barred claim only if Petitioner demonstrates cause for the default and resulting prejudice, or that the failure of the federal court to review the claim will result in a "fundamental miscarriage of justice," *i.e.*, that he is innocent.  *Calderon  v. Thompson*, 523 U.S. 538, 559 (1998); *Coleman v. United States*, 501 U.S. at 748-50.  To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his or her ability to comply with the relevant procedural rule.  *Coleman*, 501 U.S. at 753; *Restrepo v. Kelly*, 178 F.3d 634, 638 (2d Cir. 1999).  When a petitioner has failed to establish adequate cause for his procedural default, the court need not determine whether he suffered prejudice, since federal *habeas* relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated.  *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Long v. Lord*,  2006 WL 1977435, at *6 (N.D.N.Y. Mar. 21, 2006) (McCurn, S.J.).

Petitioner has not established cause for the failure to exhaust this claim and has never argued,

in either the state courts or this proceeding, that trial counsel was ineffective for failing to preserve this issue.  Since Petitioner has not established cause, the Court need not decide whether he suffered actual prejudice.  *See Stepney,* 760 F.2d at 45; *Staley v. Greiner*, 2003 WL 470568, at *7 (S.D.N.Y. Feb. 6, 2003).  Petitioner has also failed to present any new evidence to show actual innocence of the crimes for which he was convicted.  *Schulp,* 513 U.S. at 327; *Spence v. Superintendent, Great Meadow Corr. Fac.,* 219 F.3d 162, 170 (2d Cir. 2000).  Review of this claim is thus procedurally barred.

Even if this claim was not precluded, Petitioner would not be entitled to relief because, as the Appellate Division stated, the taped conversations were properly admitted into evidence.  *Taplin*, 767 N.Y.S.2d at 542.  The Fourth Amendment does not prohibit law enforcement officials from recording conversations as long as one party voluntarily consents to it.  *See* 18 U.S.C. § 2511(2)(c) ("It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to the interception."); *see also United States v. White*, 401 U.S. 745, 752-53 (1971) (plurality opinion) ("If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case.") (citation omitted); *Hernandez v. Senkowski*, 1999 WL 1495443, at *27 (E.D.N.Y. Dec. 29, 1999) ("The government does not engage in a constitutionally unreasonable search and seizure when it tape records conversations with the consent of one participant.").

Here, the record is clear that J.T. consented to the recording of her conversation with Petitioner.  D/O at pp. 21-22 (noting that J.T. gave permission at the beginning of the taped conversations to the Fulton Police Department to record the telephone calls).  The Appellate Division's rejection of this

claim was not contrary to or an unreasonable application of Supreme Court precedent. This claim should also be **dismissed**.

###### 3.     Sixth Amendment

The Sixth Amendment to the Constitution states, in part, that "[i]n all criminal prosecutions, the accused shall . . . have the assistance of counsel for his defense." U.S. Const. amend. VI. The Sixth Amendment right to counsel is offense-specific and attaches only after the initiation of adversarial judicial proceedings, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972); *see also Texas v. Cobb*, 532 U.S. 162, 167-68 (2001); *McNeil v. Wisconsin*, 501 U.S. 171, 175-76 (1991).  Pursuant to New York State Criminal Procedure Law, criminal proceedings are commenced with the filing of an accusatory instrument, including, but not limited to, a felony complaint. *See* N.Y. CRIM. PROC. LAW § 100.05; *see also Meadows v. Kuhlmann*, 812 F.2d 72, 77 (2d Cir. 1987).  Courts in New York have also indicated that the right to counsel can attach at an arraignment or upon the issuance of an arrest warrant.  *See Hemphill v. Senkowski*, 2004 WL 943567, at *8 (S.D.N.Y. May 3, 2004); *Kirby v. Senkowski*, 141 F. Supp. 2d 383, 398 (2001); *Gonzalez v. Sullivan*, 1990 WL 126189, at *1 (E.D.N.Y.), *aff'd* 934 F.2d 419 (1991).

When the recordings at issue were made, Petitioner had not yet spoken to police, much less been arrested or formally charged in connection with these allegations.  Since no formal criminal proceedings had been initiated against Petitioner, his  Sixth Amendment rights were not violated.  *See, e.g., Kirby,* 406 U.S. at 689 (formal proceedings include formal charge, preliminary hearing, indictment, information, or arraignment).

To the extent that Petitioner claims his right to counsel under the Sixth Amendment attached

because the police delayed his arrest in order to obtain a confession, the Supreme Court has held that:

> [t]here is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

*Hoffa v. United States*, 385 U.S. 293, 310 (1966) (quoted in *Johnson v. Walsh,* 2007 WL 2362490, at *18 (N.D.N.Y. Aug. 14, 2007) (Treece, J.); *Grimes v. Goord*, 371 F. Supp. 2d 305, 317 (W.D.N.Y. 2004).

Whether a petitioner was coerced into making his statements due to a delay in his arrest must be considered within the totality of the circumstances. *See Grimes,* 371 F. Supp. 2d at 317.   Under that test, Petitioner's right to counsel under the Sixth Amendment did not attach simply because a delay occurred between the time Petitioner was interviewed and the time of his arrest.  That is especially true in light of the fact that the interview lasted a short period of time.  Petitioner was told that he was not under arrest and was free to leave and there was no evidence of coercion.  Therefore, this claim should also be **dismissed**.

## C. *Brady*

Petitioner claims in Ground Three of his Petition that the prosecutor withheld information regarding "an additional allegation of the complainant at the 11th hour" that was not turned over to him until "the day of trial."  Pet. Ground Three, Attach. Question #22C.  Respondent argues that this claim is without merit.  Resp't Mem. at pp. 15-18.

Though Petitioner does not specify what evidence was withheld, it is clear from the record that there was only one piece of evidence disclosed the day of trial.  Prior to jury selection, the prosecutor moved to amend count four of the indictment to reflect an allegation of penis to anus contact based upon J.T.'s grand jury testimony.  Trial Tr. at pp. 4-16.  Later that evening, the prosecutor spoke to

Investigator Burridge and learned for the first time that J.T. had denied that any penis to anus contact had occurred when asked specifically about that type of act by Burridge. *Id*. at pp. 94-99. The prosecutor prepared a letter for counsel detailing the conversation with Burridge and turned it over to counsel in person before opening statements or any testimony was taken. Counsel objected and requested a mistrial, an adjournment, or the dismissal of count four, arguing that the information prejudiced Petitioner. *Id.* at pp. 94-95. The trial court denied these motions, ruling counsel had the information in advance of any testimony and would be able to use it during cross-examination. *Id.* at pp. 97-99.

Petitioner raised this claim on direct appeal as a subpart to a general claim that the indictment should be dismissed because the alleged *Brady* violation contaminated not just count four but the entire proceeding, including jury selection. *Id.* at pp. 55-62. The Appellate Division did not directly address this issue. It did, however, reverse and dismiss Petitioner's conviction under count four of the Indictment, ruling that the trial court erred when it permitted the prosecutor to amend the indictment to allege that Petitioner committed third degree sodomy by having penis to anus contact with the victim because it changed the theory of prosecution. *Taplin*, 767 N.Y.S.2d at 542. The Appellate Division also stated, "[w]e reject defendant's remaining contentions." Even though the state court failed to provide the reasoning for its denial of Petitioner's *Brady* claim, it disposed of the claim and reduced its disposition to judgment on the merits under §2254(d). It is thus entitled to AEDPA deference. *See Jimenez v. Walker*, 458 F.3d 130, 145 (2d Cir. 2006); *Sellan*, 261 F.3d at 312; *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810-11 (2d Cir. 2000).

A *habeas* petitioner may be entitled to relief if he shows that the government violated his right to due process by failing to turn over exculpatory material evidence before trial. *Strickler v. Greene*,

527 U.S. 263 (1999); *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).  To demonstrate a *Brady* violation, Petitioner must show that: (1) the evidence was favorable; (2) the evidence was suppressed by the prosecutor; and (3) prejudice resulted.  *Strickler*, 527 U.S. at 281-82.  Evidence is favorable to the defense when it is exculpatory (relating to the factual innocence of the defendant) or when it serves to impeach the government's witnesses.  *Id.* at 280; *United States v. Bagley*, 473 U.S. 667, 676 (1985).  Impeachment evidence may be material where the witness supplied the only evidence that linked a defendant to the crime at issue, or where the witness supplied the only support for an essential element of the crime.  *United States v. Avellino*, 136 F.3d 249, 256-57 (2d Cir. 1998).  The prosecutor "has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

The Constitution does not require that a new trial be automatically granted if *Brady* material is disclosed on "the eve of-or even during-'the midst of the pressures and paranoias of trial.'" *Jansen v. Monroe County*, 430 F. Supp. 2d 127, 131 (W.D.N.Y. 2006) (quoting *Leka v. Portuondo*, 257 F.3d 89, 100, 103 (2d Cir. 2001) ("It is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made. Thus disclosure prior to trial is not mandated."). To determine whether *Brady* material was suppressed, a reviewing court must consider whether the accused was deprived of a "meaningful opportunity to use the impeachment evidence." *Jansen*, 430 F. Supp. 2d at 131. Finally, to establish prejudice, Petitioner must show a "significant possibility" that the outcome would have been different.  *Strickler*, 527 U.S. at 300-01.

Here, Investigator Burridge's statement that J.T. denied that the anal intercourse occurred, as

charged in the amended count four of the indictment, was "both potentially exculpatory evidence and impeachment material that fell within the ambit of *Brady*." *Jansen,* 430 F. Supp. 2d at 131 (citing *Stevens v. Miller*, 1999 WL 33504438, at *5 (N.D.N.Y. Mar. 5, 1999) ("There is no question that the People had a duty to produce documents indicating that prosecution witnesses had made statements denying allegations of sexual abuse."); *see United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002) (holding that evidence is favorable to the accused if it either "tends to show that the accused is not guilty" or "impeaches a government witness.")). But this information was not suppressed within the meaning of *Brady*. On June 17, 2001, the prosecutor learned from Investigator Burridge that J.T. had denied that anal intercourse occurred, and immediately disclosed that information to defense counsel before opening statements and before J.T. or Burridge testified.

Further, counsel vigorously cross-examined J.T., gaining the concession that there was nothing in her statement to police about anal intercourse. Trial Tr. at p. 212. Counsel also cross-examined Burridge on this point. Burridge confirmed that the prosecutor asked him on June 17th if J.T. reported an incident of anal intercourse and he responded that she did not, even though he asked her if it had occurred. *Id.* at pp. 344-47. Burridge further confirmed that upon questioning Petitioner did not confess to any incident of anal intercourse. *Id.* at pp. 344-45. Counsel argued in summation that J.T. was incredible, pointing to her admission that she never told police about any incident of anal intercourse. *Id.* at p. 526. He further argued: "Then the testimony came out between Dean Burridge when I asked him, did the District Attorney's office call you two days ago before the trial started, the 17th? Was there any anal sex? What kind of case is this? We're here at trial and now we're asking whether or not the counts are even there, whether or not there's evidence." *Id.* at pp. 526-27. Under these circumstances, counsel was provided with and took advantage of a meaningful opportunity to use

this *Brady* information.  *See Jansen*, 430 F. Supp. 2d at 431.

Finally, Petitioner has not established prejudice.  Counsel used this information to impeach J.T. Further, the Appellate Division dismissed count four of the indictment, which was directly related to this *Brady* information.  *Taplin*, 767 N.Y.S.2d at 542.  Petitioner has failed to establish a *Brady* violation and this claim should be **dismissed**.

### D.  Adverse Inference Jury Charge

Petitioner next argues that he was entitled to an adverse inference jury charge because the police did not record his interview.  Pet., Attach. to Question #9, Point III.  The Appellate Division held that Petitioner failed to preserve this claim for review under New York's contemporaneous objection rule. *Taplin*, 767 N.Y.S.2d at 543 (citing CPL § 470.05(2)).  As noted above, a denial of a claim under CPL § 470.05(2) rests on an adequate and independent state procedural ground, and this claim is therefore procedurally barred.  *Garcia,* 188 F.3d at 79; *People v. Patterson*, 347 N.E.2d 898.  Petitioner has not established cause for the failure to preserve this claim for appellate review and has never argued, in either the state courts or this proceeding, that trial counsel was ineffective for that reason.  Since Petitioner has not established cause, the Court need not decide whether he suffered actual prejudice. *See Stepney,* 760 F.2d at 45; *Staley v. Greiner*, 2003 WL 470568, at *7 (S.D.N.Y. Feb. 6, 2003). Petitioner has also failed to present any new evidence to show actual innocence of the crimes for which he was convicted.  *Calderon*, 523 U.S. at 559; *Schulp,* 513 U.S. at 327.  On this record, there is no basis for overlooking the clear procedural default.  Accordingly, federal *habeas* review of these two claims is precluded.

### E.  Amendment of Indictment

Petitioner next asserts that the trial court improperly permitted the prosecutor to amend count

four of the indictment to allege penis to anus contact because it changed the theory of prosecution on the eve of trial, resulting in prejudice. Pet. Attachment to Question #9, Point I.  On direct appeal, the Appellate Division agreed with Petitioner's argument, and reversed his conviction under count four of the indictment, vacating the sentence and dismissing that count of the indictment. *Taplin*, 767 N.Y.S.2d at 542.  Since the state court already vacated Petitioner's conviction on count four of the indictment and dismissed it, Petitioner's *habeas* claim with regard to that count is moot.  *See generally, Garcia v. Rivera,* 2007 WL 2325928, at *13 (S.D.N.Y. Aug. 16, 2007) (*habeas* claim that the trial court abused its discretion when it *sua sponte* considered an attempted second degree assault as a lesser included offense of first degree assault was moot because the appellate state court vacated petitioner's attempted second degree assault conviction)(citing *Warney v. McGinnis,* 2006 WL 2482017, at *1 (W.D.N.Y. Aug. 25, 2006)(dismissing as moot *habeas* petition where Appellate Division vacated the conviction and dismissed the indictment)); *see also Delgado v. Duncan*, 2003 WL 23185682, at *5 (E.D.N.Y. Nov. 4, 2003) (dismissing as moot petitioner's claim that his conviction for criminal possession of a controlled substance should be dismissed, since petitioner had already received relief on this claim from the state Appellate Division, which vacated his conviction of that crime and dismissed the count from the indictment).

## F.  Grand Jury

Petitioner next alleges that the grand jury presentation was insufficient and complains that he was not permitted an opportunity to inspect the grand jury minutes.  Pet. Attach. to Question #9, Point IV.  Petitioner's subsequent conviction by a jury cured any arguable defects in the indictment process "because the trial conviction establishes probable cause to indict and also proof of guilt beyond a reasonable doubt."  *Montalvo v. Annetts*, 2003 WL 22962504, at *17 (S.D.N.Y. Dec. 17, 2003); *see*

*also United States v. Mechanik*, 475 U.S. 66, 70 (1986) ("The petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt."); *Davis v. Mantello*, 42 Fed. Appx. 488, 490-91 (2d Cir. 2002) (unpublished decision) ("Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court."); *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir.1989) ("If federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in federal court."); *Klosin v. Conway*,  2007 WL 2255119, at *6 (W.D.N.Y. Aug. 7, 2007) (claim of insufficiency of the evidence before the grand jury was cured by petitioner's subsequent conviction after trial and the claim was not a basis for federal *habeas* relief).  This claim should be **dismissed**.

### G.  Sentencing

Petitioner next contends that the sentence imposed should be modified in the interest of justice because it was excessive and imposed in retaliation for Petitioner's decision to reject two plea offers and proceed to trial. Pet., Attach. to Question #9, Point V.

It is firmly established that "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted); *Mayerhofer v. Bennett*, 2007 WL 1624767, at *7 (N.D.N.Y. June 6, 2007). Here, Petitioner was convicted of rape and two counts of sodomy, both class E felonies.  N.Y. PENAL LAW §§ 130.25(1) & 130.40(1).   The trial court was authorized to sentence him to a maximum indeterminate term of one and one-third to four years incarceration for each count. N.Y. PENAL LAW §§ 70.00(1),(2)(e), (3)(b).  While Petitioner was sentenced to the maximum term permissible for each

crime, his sentence did not exceed it.   Further, consecutive sentences on the rape and sodomy convictions were properly imposed under New York law for separate criminal acts as they were separate and distinct offenses.   N.Y. PENAL LAW § 70.25.  Since the imposed sentence was within the statutory range, this theory cannot afford Petitioner relief.

Petitioner further alleges that the sentence imposed was in retaliation for his refusal to accept plea offers.  However, the sentencing judge never suggested that the sentence was based on Petitioner's refusal of the plea offers.  The fact that the court, following conviction, imposed the maximum sentence does not, in itself, demonstrate actual vindictiveness. *See*, *e.g., Corbitt v. New Jersey*, 439 U.S. 212, 219, 223 (1978).  The Supreme Court noted in *Corbitt* that

> We have squarely held that a State may encourage a guilty plea by offering substantial benefits in return for the plea[.]  We discern no element of retaliation or vindictiveness against [appellant] for going to trial. There is no suggestion that he was subjected to unwarranted charges. Nor does this record indicate that he was being punished for exercising a constitutional right[.]  There is no doubt that those homicide defendants who are willing to plead *non vult* may be treated more leniently than those who go to trial, but withholding the possibility of leniency from the latter cannot be equated with impermissible punishment as long as our cases sustaining plea bargaining remain undisturbed.

*Id.*

Finally, to the extent that Petitioner's claim could arguably be viewed as a challenge under the Eighth Amendment's prohibition of cruel and unusual punishment, that claim also fails. The Eighth Amendment forbids only extreme sentences which are "grossly disproportionate" to the crime of conviction. *Lockyer v. Andrade,* 538 U.S. 63, 72-73 (2003); *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991).  It is well-established that a sentence of imprisonment that is within the limits of a valid state statute is not cruel and unusual punishment in the constitutional sense. *See White*, 969 F.2d at 1383; *Lou v. Mantello*, 2001 WL 1152817, at *13 (E.D.N.Y. Sept. 25, 2001).  The Supreme Court has held that, for offenses less than manslaughter, sentences longer than 25 years are not grossly

disproportionate.  *See Staubitz v. Lord*, 2006 WL 3490335, at *2 (E.D.N.Y. Dec. 1, 2006) (citing *Ewing*

*v. California*, 538 U.S. 11 (2003) (25 years to life for grand theft) and *Harmelin*, 501 U.S. 957 (1991)

(life in prison without the possibility of parole for cocaine possession)).  Petitioner's sentence was not

contrary to nor an unreasonable application of that precedent.  Since the sentence imposed was plainly

within the limits authorized by statute, and was not grossly disproportionate to the crime of conviction,

this ground of the Petition should be **denied**.

### H.  Weight/Sufficiency of the Evidence

Petitioner next claims that the verdict was against the weight of the evidence because his

admissions did not match any date in the indictment, the trial court limited his ability to cross-examine

J.T., two defense witnesses refuted J.T.'s allegations regarding anal intercourse, and the proof was

"flimsy" and "unconvincing."  Pet., Attach. to Question #9, Point VI.  Petitioner characterized this claim

as a weight of the evidence claim and his allegations appear to challenge credibility and weight of the

proof.  But he also asserts that "there was insufficiency of evidence."  *Id.*

As an initial matter, the Court notes that Petitioner's arguments are virtually identical to those

contained in the direct appeal brief.  *See id.*; Dkt. No. 12, Ex. L, Appellate Br. at p. 69.  As a result, his

arguments are couched as "weight of the evidence" challenges.  "Weight of the evidence" claims derive

from CPL § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction

where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against

the weight of the evidence."  CPL § 470.15(5); *People v. Bleakley*, 508 N.E.2d 672 (N.Y. 1987).  Since

weight of the evidence claims are grounded in the state criminal procedure statute, they are not

cognizable on *habeas* review.  *See* 28 U.S.C. § 2254(a) (permitting federal *habeas corpus* review only

where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal

law or treaty"); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (*habeas corpus* review not available to remedy alleged error of state law); *Hogan v. Superintendent of Livingston Corr. Fac.*, 2007 WL 2907322, at *8 (W.D.N.Y. Oct. 3, 2007) ("Since a 'weight of the evidence' claim is purely a matter of state law, it is not cognizable on habeas review."); *Stein v. Artus*, 2007 WL 2778914, at *7 (N.D.N.Y. Sept. 19, 2007).  Accordingly, to the extent that Petitioner challenges the weight of the evidence, that claim should be **denied**.

Petitioner also asserts within this claim that "there was insufficiency of evidence to convict him and find him guilty beyond a reasonable doubt."  Pet., Attach. to Question #9, Point VI.  Because petitioner is *pro se*, these claims will be liberally construed as "insufficiency of the evidence" claims. *See*, *e.g.*, *Welch,* 2007 WL 2028048 at *7 (recognizing that complaints of *pro se* petitioners are to be considered liberally in their favor and, therefore, construing *pro se* petitioner's "weight of the evidence" claims as "insufficiency of the evidence" claims).

A sufficiency challenge was apparently presented to the Appellate Division on direct appeal. *See* Dkt. No. 12, Ex. L, Appellate Br. at p. 69 ("Defendant submits that there was insufficient evidence to find him guilty, beyond a reasonable doubt, of any of the charges[.]").  The prosecutor responded by briefing both the weight and sufficiency of the evidence arguments. Dkt. No. 12, Ex. M, People's Br. on Appeal, at pp. 21-23. The Appellate Division did not explicitly render a decision with regard to the sufficiency of the evidence, but it stated that it rejected Petitioner's "remaining contentions," and denied the weight of the evidence claim.  *See Taplin*, 767 N.Y.S.2d at 542.  The court then affirmed the judgment of conviction for all but count four of the indictment.  *Id.* at 543. Although the Appellate Division failed to provide reasoning for the denial of the sufficiency claim, it disposed of it and reduced its disposition to judgment on the merits under Section 2254(d), and its decision is therefore entitled to

AEDPA deference. *Jimenez*, 458 F.3d at 145; *Sellan*, 261 F.3d at 312.

A petitioner who challenges a conviction on the sufficiency of the evidence bears a "very heavy burden." *United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which he is charged. *See Fiore v. White*, 531 U.S. 225, 228-29 (2001); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). This inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993)(emphasis in original). A *habeas* petitioner claiming that there was insufficient evidence supporting the conviction is entitled to relief under 28 U.S.C. § 2254 only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson,* 443 U.S. at 324; *see also Schlup v. Delo*, 513 U.S. 298, 323 n.38 (1995). The reviewing court is required to consider the evidence in the light most favorable to the prosecution, and draw all inferences in its favor. *Jackson,* 443 U.S. at 319.[6] "When considering the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" *Ponnapula,* 297 F.3d at 179 (quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999)).

To sustain Petitioner's conviction for third degree rape, the People had to prove that between November 1999 and March 2000, Petitioner was over the age of twenty-one and he engaged in sexual intercourse with J.T., who was under age seventeen. N.Y. PENAL LAW § 130.25(2); *Mugalli v. Ashcroft*,

---

[6] The *Jackson* standard is clearly established federal law as determined by the Supreme Court. *See Huber v. Schriver*, 140 F. Supp. 2d 265, 276 n. 5 (E.D.N.Y. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 114 (2d Cir. 2000)) (other citation omitted); *see also Santana v. Kuhlmann*, 232 F. Supp. 2d 154, 166-67 (S.D.N.Y. 2002).

258 F.3d 52, 60-61 (2d Cir. 2001).  The evidence established that Petitioner was thirty-three years old at the time of the rape.  Trial Tr. at p. 326.  During the relevant time period, J.T. was fourteen years old. Trial Tr. at pp. 171 & 253-55.  J.T. testified that she had sexual intercourse with Petitioner during that time period and Petitioner confessed to having done so.  *Id.* at pp. 253-56 & 332.  This evidence was sufficient to sustain Petitioner's conviction for third degree rape under count three of the indictment.

To sustain Petitioner's conviction for third degree sodomy, the People had to prove that in April 2001, Petitioner was over the age of twenty-one and he engaged in oral sexual conduct with J.T., who was under seventeen. N.Y. PENAL LAW § 130.40(2).  The evidence established that Petitioner, age thirty-three, placed his penis in J.T.'s mouth in April 2001 when she was fifteen years old.  Trial Tr. at pp. 171 & 173-75.  Petitioner admitted to engaging in this conduct.  *Id.* at pp. 332-33.  This evidence was sufficient to sustain his conviction for third degree sodomy under count two of the indictment. Accordingly, this claim should be **dismissed**.

### III.  CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that Taplin's Petition for a Writ of *Habeas Corpus* (Dkt. No. 1) be **denied**; and it is further

**RECOMMENDED**, that because the Court finds Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), no certificate of appealability should issue with respect to any of Petitioner's claims. *See* 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000); and it is further

**ORDERED**, that the Clerk serve a copy of this Report-Recommendation and Order on the parties.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*), 892 F.2d 15 (2d Cir. 1989); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a) & 6(e).

Date:   June 2, 2008
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge